No. 84–1731. LORAIN JOURNAL CO. ET AL. v. MILKOVICH. Sup. Ct. Ohio. Certiorari denied.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Error and misstatement are inevitable in any scheme of truly free expression and debate. Because punishment of error may induce a cautious and restrained exercise of the freedoms of speech and press, the fruitful exercise of these essential freedoms requires a degree of "breathing space." *NAACP* v. *Button*, 371 U. S. 415, 433 (1963). Accordingly, "we protect some falsehood in order to protect speech that matters." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 341 (1974); see also *St. Amant* v. *Thompson*, 390 U. S. 727, 732 (1968). The *New York Times* actual malice

standard defines the level of constitutional protection appropriate in the context of defamation of a public official. It rests on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). In *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), the *New York Times* standard was extended to statements criticizing "public figures" because we recognized that " 'public figures,' like 'public officials,' often play an influential role in ordering society" and that therefore "[o]ur citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' " 388 U. S., at 164 (Warren, C. J., concurring in result). In *Gertz* v. *Robert Welch, Inc.*, *supra*, we limited the applicability of the *New York Times* standard by holding that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U. S., at 347 (footnote omitted).

In this case, the Ohio Supreme Court found *Gertz* rather than *New York Times* applicable to respondent Milkovich's libel suit against petitioners. Ostensibly, then, the issue presented in this petition is simply the narrow one whether petitioners will be required to pay damages upon a showing of negligence or actual malice. However, by allowing damages to be awarded upon a showing of negligence, thereby diminishing the "breathing space" allowed for free expression in the *New York Times* case, the decision in *Gertz* exacerbated the likelihood of self-censorship with respect to reports concerning "private individuals." See 418 U. S., at 365–368 (BRENNAN, J., dissenting). Consequently, the rules we adopt to determine an individual's status as "public" or "private" powerfully affect the manner in which the press decides what to publish and, more importantly, what not to publish. In finding *New York Times* inapplicable, the Ohio Supreme Court read the "public official" and "public figure" doctrines in an exceptionally narrow way that is sure to restrict expression by the press in Ohio. Its decision is especially unfortunate in that it most affects reporting by local papers about the local controversies that constitute their primary content. Moreover, it is these local papers that are most coerced by the threat of libel damages

since they can least afford the expense of damages awards. I therefore dissent and would grant certiorari in order to review this important constitutional question.

## I

On February 9, 1974, a melee occurred at a high school wrestling match between Maple Heights and Mentor High Schools; several wrestlers were injured, four of them requiring treatment at a hospital. The Ohio High School Athletic Association (OHSAA) conducted a hearing into the occurrence and censured Michael Milkovich, the Maple Heights coach and a teacher at the high school, for his conduct in encouraging the brawl. In addition, the OHSAA placed the Maple Heights team on probation for the school year and declared it ineligible to compete in the state wrestling tournament. Ted Diadiun, a sports columnist for the News-Herald of Willoughby, Ohio, attended and reported on both the match and the hearing.

A group of parents and wrestlers subsequently filed suit in Franklin County Common Pleas Court, alleging that the OHSAA had denied the team due process and seeking to reverse the declaration of ineligibility. Milkovich, though not a party to this lawsuit, appeared as a witness for the plaintiffs. On January 7, 1975, the court held that the wrestling team had been denied due process and enjoined the team's suspension.

The next day, Diadiun wrote another column entitled "Maple beat the law with the 'big lie.'" Diadiun, who had not attended the court hearing, based the story on a description of the judicial proceedings given him by an OHSAA Commissioner and on his own recollection of the wrestling match and ensuing OHSAA hearing. After reporting the result of the lawsuit, the column stated "[b]ut there is something much more important involved here than whether Maple was denied due process by the OHSAA":

> "When a person takes on a job in a school, whether it be as a teacher, coach, administrator or even maintenance worker, it is well to remember that his primary job is that of educator.
> "There is scarcely a person concerned with school who doesn't leave his mark in some way on the young people who pass his way—many are the lessons taken away from school by students which weren't learned from a lesson plan or out of a book. They come from personal experiences with and ob-

servations of their superiors and peers, from watching actions and reactions.

"Such a lesson was learned (or relearned) yesterday by the student body of Maple Heights High School, and by anyone who attended the Maple-Mentor wrestling meet of last Feb. 8.

"A lesson which, sadly, in view of the events of the past year, is well they learned early.

"It is simply this: If you get in a jam, lie your way out."

Diadiun stated that Milkovich and others had "misrepresented" the occurrences at the OHSAA hearing but that Milkovich's testimony "had enough contradictions and obvious untruths so that the six [OHSAA] board members were able to see through it." Diadiun then asserted that by the time the court hearing was held, Milkovich and a fellow witness "apparently had their version of the incident polished and reconstructed, and the judge apparently believed them." Diadiun opined that anyone who had attended the match "knows in his heart that Milkovich . . . lied at the hearing after . . . having given his solemn oath to tell the truth. But [he] got away with it." The column concluded:

"Is that the kind of lesson we want our young people learning from their high school administrators and coaches?
"I think not."

Milkovich filed a libel action in state court against Diadiun, the News-Herald, and the latter's parent, the Lorain Journal Company (petitioners). The court denied petitioners' motion for summary judgment, but held that Milkovich was a public figure and, as such, was required to meet the standards established in *New York Times*. After five days of trial, at the close of Milkovich's case, petitioners moved for a directed verdict. The court granted this motion, finding that Milkovich's evidence failed to establish actual malice as a matter of law. The Ohio Court of Appeals reversed and remanded. *Milkovich v. Lorain Journal Co.*, 65 Ohio App. 2d 143, 416 N. E. 2d 662 (1979). It noted that the Common Pleas Court had accepted Milkovich's testimony, and ruled that this alone constituted sufficient evidence of actual malice to survive a motion for a directed verdict. The Ohio Supreme Court dismissed the appeal as raising no substantial constitutional question. This Court denied certiorari; I dissented. *Lorain Journal Co. v. Milkovich*, 449 U. S. 966 (1980).

On remand and before a new judge in the Common Pleas Court, petitioners filed a second motion for summary judgment. The court reaffirmed the earlier holding that Milkovich was a public figure for purposes of the *New York Times* test and granted the motion. The court held that Milkovich had failed to proffer sufficient evidence for a jury to conclude that Diadiun's column was published with actual malice. Alternatively, the court found that the column constituted a privileged expression of opinion. This time the Ohio Court of Appeals affirmed, holding that the law of the case did not bar a second motion for summary judgment and agreeing with both of the trial court's particular holdings.

The Ohio Supreme Court reversed. *Milkovich* v. *News-Herald*, 15 Ohio St. 3d 292, 473 N. E. 2d 1191 (1984). Concluding "upon a careful review of the record" that Milkovich had not waived the right to challenge the earlier determination of his status as a public figure, the court held that Milkovich was neither a "public official" nor a "public figure," and that the contents of the challenged article were facts which, if false, are not protected by the First Amendment. *Id.*, at 294–297, 473 N. E. 2d, at 1193–1196. This petition followed.

## II

### A

In *New York Times*, we had no occasion "to determine how far down into the lower ranks of government employees the 'public official' designation would extend . . . ." 376 U. S., at 283, n. 23. That question was addressed two Terms later in *Rosenblatt* v. *Baer*, 383 U. S. 75 (1966). Consistent with the premise of *New York Times* that "[c]riticism of those responsible for government operations must be free, lest criticism of government itself be penalized," the Court in *Rosenblatt* held that "[i]t is clear . . . that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs." 383 U. S., at 85. We recognized there, however, that First Amendment protection cannot turn on formalistic tests of how "high" up the ladder a particular government employee stands. Rather, we determined, the focus must be on the nature of the public employee's function and the public's particular concern with his work. Accordingly, we held:

> "Where a position in government has such apparent impor-
> tance that the public has *an independent interest in the quali-
> fications and performance of the person who holds it, beyond
> the general public interest in the qualifications and perform-
> ance of all government employees,* . . . the *New York Times*
> malice standards apply." *Id.*, at 86 (emphasis added).

In *Rosenblatt* itself, we found this standard satisfied with respect
to Baer, a supervisor of a county ski resort employed by and
responsible to county commissioners.

The Ohio court apparently read the language in *Rosenblatt*
referring to government employees having "substantial respon-
sibility for or control over the conduct of government affairs"
as restricting the public official designation to officials who set
governmental policy. This interpretation led it to conclude that
finding a public employee like Milkovich to be a "public official" for
purposes of defamation law "would unduly exaggerate the 'public
official' designation beyond its original intendment." 15 Ohio St.
3d, at 297, 473 N. E. 2d, at 1195–1196.

The Ohio court has seriously misapprehended our decision in
*Rosenblatt*. Indeed, the status of a public school teacher as a
"public official" for purposes of applying the *New York Times* rule
follows *a fortiori* from the reasoning of the Court in *Rosenblatt*.
As this Court noted in holding that the Equal Protection Clause
does not bar a State from excluding aliens from teaching positions
in the public schools, "public school teachers may be regarded as
performing a task 'that go[es] to the heart of representative gov-
ernment.'" *Ambach* v. *Norwick*, 441 U. S. 68, 75–76 (1979)
(quoting *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973)). We
have repeatedly recognized public schools as the Nation's most
important institution "in the preparation of individuals for partici-
pation as citizens, and in the preservation of the values on which
our society rests." 441 U. S., at 76–77. See also *San Antonio
Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 29–30 (1973);
*Wisconsin* v. *Yoder*, 406 U. S. 205, 213 (1972); *Brown* v. *Board of
Education*, 347 U. S. 483, 493 (1954). The public school teacher
is unquestionably the central figure in this institution:

> "Within the public school system, teachers play a critical
> part in developing students' attitude toward government and
> understanding of the role of citizens in our society. Alone
> among employees of the system, teachers are in direct, day-

to-day contact with students both in the classrooms and in the other varied activities of a modern school. In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way course material is communicated to students. They are responsible for presenting and explaining the subject matter in a way that is both comprehensible and inspiring. No amount of standardization of teaching materials or lesson plans can eliminate the personal ·qualities a teacher brings to bear in achieving these goals. Further, a teacher serves as a role model for his students, exerting a subtle but important influence over their perceptions and values. Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities. This influence is crucial to the continued good health of a democracy." *Ambach, supra,* at 78–79 (footnotes omitted).[1]

"[T]eachers . . . possess a high degree of responsibility and discretion in the fulfillment of a basic governmental obligation," *Bernal* v. *Fainter,* 467 U. S. 216, 220 (1984),[2] and it is self-evident that "the public has an independent interest in the qualifications and performance" of those who teach in the public high schools that goes "beyond the general public interest in the qualifications and performance of all government employees," *Rosenblatt, supra,* at 86.[3] Public school teachers thus fall squarely

---

[1] JUSTICE BLACKMUN's dissent in *Ambach,* which I joined, expressed identical sentiments. See 441 U. S., at 88 ("One may speak proudly of the role model of the teacher, of his ability to mold young minds, of his inculcating force as to national ideals, and of his profound influence in the impartation of our society's values").

[2] See also *Board of Education* v. *Pico,* 457 U. S. 853, 864 (1982) (plurality opinion); *Cabell* v. *Chavez-Salido,* 454 U. S. 432, 457, n. 8 (1982); *Zykan* v. *Warsaw Community School Corporation,* 631 F. 2d 1300, 1307 (CA7 1980).

[3] This perfectly obvious conclusion has led at least one other court to reach a conclusion directly contrary to that of the Ohio Supreme Court. See *Johnston* v. *Corinthian Television Corp.,* 583 P. 2d 1101 (Okla. 1978) (grade school wrestling coach is "public official"). On the other hand, the state courts are in general disarray over the application of the *New York Times* standard to various other types of public employees. See Annot., Libel and Slander: Who is a Public Official or Otherwise Within the Federal Constitutional Rule

within the rationale of *New York Times* and *Rosenblatt*. Moreover, Diadiun's column challenged Milkovich's qualifications to teach young students in light of his conduct in connection with the Maple Heights/Mentor High School incident. It is precisely this type of discussion that *New York Times* and its progeny seek to protect.

B

The Ohio Supreme Court also held that Milkovich was not a "public figure" within the meaning of our decisions. It concluded that this Court has "retreated" from prior holdings and "redefined" public figure status to include only two narrowly defined classes of individuals. 15 Ohio St. 3d, at 294–297, 473 N. E. 2d, at 1193–1195. Milkovich was found to fit in neither of these categories. *Ibid.* Here too, the state court misreads our decisions.

Our first encounter with the application of the *New York Times* test to nongovernment officials came in *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967). *Butts* actually decided two separate cases that were consolidated for review. In the first case, Butts, the athletic director at the University of Georgia[4] and "a well-known and respected figure in coaching ranks," *id.*, at 136, filed a libel action after the Saturday Evening Post published an article accusing Butts of having conspired to fix a football game with the University of Alabama. In the second case, Walker, a retired career Army officer who was prominent in the local community, sued the Associated Press after it filed a news dispatch giving an eyewitness account of a riot that erupted at the University of Mississippi when federal officers tried to enforce a court decree ordering the enrollment of James Meredith, a black, as a student at the University. The report stated that Walker had taken command of the violent crowd and personally had led a charge against federal marshals. Although the Court in *Butts* failed to reach a consensus on the standard of liability in suits brought by "public figures," seven Members of the Court agreed that both Butts and

---

Requiring Public Officials to Show Actual Malice, 19 A. L. R. 3d 1361 (1968 and 1985 Supp.). I would also grant certiorari to clarify the law in this regard.

[4] Although the University of Georgia was a state university, Butts was employed by the Georgia Athletic Association, a private corporation, rather than by the State itself. His case thus did not raise the issue whether he was a "public official" for purposes of the *New York Times* test. See *Butts*, 388 U. S., at 135, and n. 2.

Walker occupied this status.[5]   Justice Harlan explained in his plurality opinion:

> "[B]oth Butts and Walker commanded a substantial amount of independent public interest at the time of the publications; both, in our opinion, would have been labeled 'public figures' under ordinary tort rules. . . . Butts may have attained that status by position alone and Walker by his purposeful activity amounting to a thrusting of his personality into the 'vortex' of an important public controversy, but both commanded sufficient continuing public interest and had sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Id.*, at 154–155.

As Justice Harlan's opinion indicates, the two cases considered in *Butts* exemplify alternative ways in which an individual may become a "public figure."[6]   Our subsequent cases have elaborated on this framework; we have held that "[i]n some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," while, "[m]ore commonly, an individual voluntarily injects himself or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U. S., at 351; see also, *Time, Inc.* v. *Firestone*, 424 U. S. 448, 453 (1976); *Hutchinson* v. *Proxmire*, 443 U. S. 111, 134 (1979); *Wolston* v. *Reader's*

---

[5] Justices Black and Douglas found it unnecessary to reach the issue consistent with their views that the First Amendment completely prohibits damages for libel.   *Id.*, at 170 (Black, J., joined by Douglas, J., concurring in result in Walker's case and dissenting in Butts' case); see also *New York Times*, 376 U. S., at 293 (Black, J., concurring).

[6] Like Butts and Walker, Milkovich would be labeled a "public figure" under ordinary tort rules.   See W. Prosser, Law of Torts § 118, pp. 823–824 (4th ed. 1971); cf. *Stryker* v. *Republic Pictures Corp.*, 108 Cal. App. 2d 191, 238 P. 2d 670 (1951); *Molony* v. *Boy Comics Publishers*, 277 App. Div. 166, 98 N. Y. S. 2d 119 (1950); *Wilson* v. *Brown*, 189 Misc. 79, 73 N. Y. S. 2d 587 (1947).   Indeed, since in my opinion the scope of the constitutional privilege exceeds that of the privilege recognized at common law for reports about public figures, this fact alone should be sufficient to conclude that Milkovich is a "public figure."   However, our subsequent decisions have treated the constitutional privilege without reference to the common-law privilege, *e. g., Time, Inc.* v. *Firestone*, 424 U. S. 448, 453 (1976); *Wolston* v. *Reader's Digest Assn., Inc.*, 443 U. S. 157, 165–169 (1979), and I therefore discuss Milkovich's status under our decisions without reference to the common law.

*Digest Assn., Inc.,* 443 U. S. 157, 164 (1979). However, the ultimate touchstone is always whether an individual has "assumed [a] rol[e] of especial prominence in the affairs of society [that] invite[s] attention and comment." *Gertz, supra,* at 345. These categories are merely descriptive; they are not, as the Ohio Supreme Court assumed, rigid, technical standards.

Petitioners spend most of their efforts attempting to analogize their case to that of Butts, and, indeed, the analogy is a strong one.[7] A better argument can be made, however, that Milkovich is a "public figure," like Walker, for purposes of this particular public controversy. Under this prong of "public figure" analysis, an individual who "voluntarily injects himself or is drawn into a particular public controversy" becomes a public figure with respect to public discussion of that controversy. *Gertz, supra,* at 351. Walker, for example, was deemed to have "thrus[t] his personality into the 'vortex' of an important public controversy" by allegedly encouraging a riot. Milkovich's conduct was remarkably similar to Walker's—the allegedly libelous publication was inspired by a brawl that resulted in injuries to a number of students;

---

[7] Like Butts, Milkovich is "a well-known and respected figure in coaching ranks." Indeed, he is unquestionably one of America's outstanding coaches. No other wrestling coach in America has achieved a record even close to his, a fact that has been recognized by numerous organizations. He has received the National Coach of the Year Award, the National Council of High School Coaches Award, the Scholastic Wrestling News National Achievement Award, a United States Wrestling Federation Award, and numerous other gifts, proclamations, and awards. He was inducted into the National Helms Hall of Fame and the Ohio Coaches Hall of Fame and received the Kent State University Hall of Fame Award. He has been cited in the Congressional Record and in the records of both the Ohio Senate and House of Representatives. He was similarly honored by the city of Cleveland and by his own city of Maple Heights, which celebrated "Mike Milkovich Day." He is a much sought after speaker by coaches' associations throughout the United States and conducts wrestling clinics across the country under the aegis of various state and coaches' organizations. See *Milkovich v. News-Herald,* 15 Ohio St. 3d 292, 296, and n. 1, 473 N. E. 2d 1191, 1194, and n. 1 (1984). Nor will it do simply to dismiss Milkovich's achievements as merely those of a high school coach. To be sure, as a general matter collegiate athletics obtains wider exposure than high school athletics. But with the exception of a few rather flamboyant figures who gain national exposure, most coaches—like Butts—are unknown outside sports' circles and the local community. Milkovich is probably as well known both locally and in the wrestling community as was Butts in his respective circles.

Milkovich was alleged to have incited the fracas by egging on the crowd. While this fight did not compare in size or ferocity to the riots in which Walker participated at the University of Mississippi, it was a public controversy of concern to residents of the local community, as important to them as larger events are to the Nation. Significantly, it was only in this community that the challenged article was circulated. See *Rosenblatt* v. *Baer*, 383 U. S., at 83 ("The subject matter may have been only of local interest, but at least here, where publication was addressed primarily to the interested community, that fact is constitutionally irrelevant"). The conclusion that Milkovich was a limited purpose public figure therefore seems quite straightforward.

The Ohio Supreme Court nevertheless concluded that Milkovich could not be classed a "public figure" because he "never thrust himself to the forefront of [the] controversy in order to influence its decision." 15 Ohio St. 3d, at 297, 473 N. E. 2d, at 1195. However, the *New York Times* standard is not limited to discussion of individuals who deliberately seek to involve themselves in public issues to influence their outcome. Our decisions in this area rest at bottom on the need to protect public discussion about matters of legitimate public concern. See *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 755–761 (1985) (opinion of POWELL, J., joined by REHNQUIST and O'CONNOR, JJ.); *id.*, at 763–764 (opinion of BURGER, C. J.); *id.*, at 777–789 (opinion of BRENNAN, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ.). Although not every person connected to a public controversy is a "public figure," *Gertz, supra*, the *New York Times* protections do, and necessarily must, encompass the major figures around which a controversy rages. See *Wolston* v. *Reader's Digest Assn., supra*, at 167; see also *Gertz, supra*, at 351 (public figure is one who "voluntarily injects himself *or is drawn* into a particular public controversy" (emphasis added)).[8]

---

[8] In *Wolston*, we held that although an individual's failure to appear before a grand jury investigating Soviet espionage was newsworthy, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." 443 U. S., at 167. Rather, we emphasized, "a court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Ibid.* (quoting *Gertz*, 418 U. S., at 352). Because it was "clear that [Wolston] played only a minor role in whatever public controversy there may have been concerning the investigation of Soviet espio-

We only recently acknowledged the "compelling" nature of the local interest in preventing violence and preserving discipline in the Nation's high schools. *New Jersey* v. *T. L. O.*, 469 U. S. 325, 350 (1985). A large fight between the students of two rival schools quite legitimately raises serious concerns for the entire community, particularly when, as here, it results in injury to students.[9] The present controversy centered primarily around the conduct of one man—Milkovich—in encouraging the fight; that conduct allegedly resulted in an OHSAA hearing, his censure by that association, and the disqualification of his team from eligibility in the state wrestling tournament.[10] To say that Milkovich nevertheless was not a public figure for purposes of discussion about the controversy is simply nonsense.

## III

The "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times*, 376 U. S., at 270, applies as much to debate in the local media about local issues as it does to debate in the na-

---

nage," he was held not to be a public figure. 443 U. S., at 167. Milkovich, on the other hand, was clearly the major player in this public controversy.

[9] At one point in its opinion, the Ohio Supreme Court cited our holding in *Time, Inc.* v. *Firestone*, 424 U. S. 448 (1976), that Mrs. Firestone's divorce was "not the sort of 'public controversy' envisioned in *Gertz*." 15 Ohio St. 3d, at 296, 473 N. E. 2d, at 1194. The nature of the controversy here is completely different. This was not a private matter of public concern merely to gossips. Rather, the controversy in which Milkovich was involved was of immediate importance to parents and others in the community.

[10] These facts distinguish this case from *Hutchinson* v. *Proxmire*, 443 U. S. 111 (1979). In *Hutchinson*, a hitherto unknown research scientist was allegedly libeled when Senator Proxmire awarded his Government sponsor a "Golden Fleece of the Month Award" to publicize what the Senator perceived to be the most egregious examples of wasteful Government spending. Proxmire argued that Hutchinson became a limited purpose public figure as a result of the publicity surrounding his being awarded a "Golden Fleece." We rejected this argument on the ground that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.*, at 135. The controversy surrounding the fight at the high school, on the other hand, was not created by Diadiun's column. The event itself created a stir, leading to a hearing, censure of Milkovich, and disqualification of his team. Diadiun's column merely reported his view, as an observer of the initial fight, that such a man ought not be allowed to teach young students.

tional media over national issues. This Court's *obligation* to preserve the precious freedoms established in the First Amendment is every bit as strong in the context of a local paper's report of an incident at a local high school as it is in the context of an advertisment in one of the Nation's largest newspapers supporting the struggle for racial freedom in the South. Because the decision below will stifle public debate about important local issues, I respectfully dissent.