[689 NYS2d 21]

Charles Huggins, Appellant, v Melba Moore, Defendant, and Daily News, L.P., et al., Respondents.

First Department, April 8, 1999

## APPEARANCES OF COUNSEL

*Bradley C. Rosen* of counsel, Rochester (*Scott A. Korenbaum* on the brief; *Culley, Marks, Tanenbaum, Capell & Pezzulo,* and *Kupfer Rosen & Herz, L. L. P.,* attorneys), for appellant.

*Eve B. Burton* of counsel, New York City (*R. Bruce Rich* and *Christopher J. Morvillo* on the brief; *The Daily News, L.P.,* and *Weil, Gotshal & Manges, L. L. P.,* attorneys), for respondents.

## OPINION OF THE COURT

Tom, J.

The present defamation action, one of several launched by acrimony arising from the divorce of singer Melba Moore and her husband, present plaintiff Charles Huggins, centers on three Daily News articles by gossip columnist Linda Stasi over the course of a month reporting Moore's views and statements on purported aspects of the divorce.

Melba Moore, a Tony Award winner and two-time Grammy Award nominee, is a well-known entertainer. Huggins is a producer in the musical entertainment business; his production company is Hush Productions (Hush), which managed Moore as well as other performers. The parties married in 1976, and have one child. In 1990, Huggins obtained an uncontested divorce in the Commonwealth of Pennsylvania. Moore subsequently commenced an action in Supreme Court, New York County (Elliott Wilk, J.) seeking a declaration that the Pennsylvania divorce decree was invalid. That IAS Court granted Moore relief, by judgment entered April 12, 1993, declaring the Pennsylvania divorce invalid, dissolving the marriage on the basis of Huggins' constructive abandonment of Moore, and awarding her custody and child support. The divorce judgment incorporated by reference the terms of a separation agreement that, *inter alia*, provided that the parties would maintain confidentiality about each other, would refrain from disparaging each other, and specifically would not participate in the publication of any article describing either the other party or the marriage. The separation agreement also provided for a property division, in which Moore specifically waived any rights in Hush and other enumerated businesses and properties. The agreement was concluded with an attorney's certification for each party indicating each party's acknowledgment of understanding of all terms and the voluntariness of the respective executions, which Moore also subsequently acknowledged in open court.

On May 5, 1993, Moore commenced a Federal action for fraud in the Southern District of New York against Huggins' divorce attorney, Brian Golden, alleging the attorney's role in concert with Huggins in obtaining the purportedly fraudulent Pennsylvania divorce. The basic thrust of the fraud claim was that Huggins had falsely alleged a Pennsylvania residence, thereby deceptively establishing the jurisdictional basis of the Pennsylvania divorce action, and that Moore had been unaware that the divorce action was pending, which was "a scheme concocted by Huggins" to deprive her of a New York forum.

Notwithstanding the confidentiality clause of the separation agreement, Moore contacted Linda Stasi of The Daily News. As a result, Stasi wrote, and The Daily News published, three stories, on June 11, 1993, June 28, 1993 and July 9, 1993, giving rise to the present action. The Daily News and Stasi assert that, in verifying Moore's story, Stasi attempted, though unsuccessfully, to contact Golden, Huggins' Pennsylvania divorce attorney, and that she was provided by Moore with the Federal fraud complaint and court documents connected to the New York divorce. Stasi does not claim to have tried reaching Huggins, the subject of the stories, for confirmation prior to publication. Nor did she, or the News, respond to a June 17, 1993 letter from Bradley Rosen, Huggins' New York attorney, sent after publication of the first article, alerting the News to potential falsities, noting that Huggins had never been contacted to verify source material, opining that the omission would constitute reckless disregard for the truth under New York law, and requesting that the News contact him as an alternative to seeking judicial relief.

Although many of the 18 statements itemized in Huggins' complaint as being defamatory are not actionable, relevant portions of the itemized statements require a verbatim reprinting, insofar as the broader context of the stories is in issue, as recognized by the IAS Court. However, even the most flexible application of context does not insulate certain starkly factual statements, not drawn directly from court documents or otherwise protected under traditional libel standards. The statements in contention in the three articles are:

June 11, 1993 Article

(1) "If you think that you made a huge mistake with that husband of yours, trust us, there's always worse."

(2) "After 15 years of marriage to former club owner/current music honcho Charles Huggins, Moore walked to the mailbox of the home the couple shared with their 16-year-old daughter

to find—much to her surprise—a final divorce decree. Not only weren't they even legally separated, Moore tells us that she and Huggins 'lived together, slept together—I had no idea any of this was going on.'"

(3) "She says, 'My name was forged on documents.' * * * Such as? Such as tax returns, and yes, divorce papers, claims Moore."

(4) "But why would he divorce her without her ever knowing she was even having marital problems? 'For the purpose of embezzling me out of all my assets. We started a management company together, Hush Productions, and signed [several enumerated performers] and I just figured that he took care of the business end.'"

(5) "[In the New York divorce action, Moore] settled for a measly $250,000, simply because, she says, she found herself penniless and without any assets—everything was in Huggins' name. But so far, Huggins has only paid $25,000—which went to bills and legal fees. 'I've tried keeping everything quiet,' a tearful Moore told us, 'for my daughter's sake. But he's a bully. His business associates are beginning to realize he's a fraud.'"

(6) "'He has withheld money for food for myself and my daughter. It's a nightmare.'"

(7) "She believes he blackballed her in the industry because she couldn't get work. When she finally did * * * the IRS was waiting. 'I was an easy mark.'"

June 28, 1993, Article

(8) "Recently we told you that singer Melba Moore poured out her heart to us about the abuse she says she endured from her husband of many years, music honcho Charles Huggins."

(9) "We later ran into the singer at the Apollo Theater, and she said that speaking out to us changed everything for her. She knew she couldn't keep the nightmare, or the fact that she and her daughter were penniless, a secret any longer."

(10) "In fact, the other day she gave an address to the annual convention of 100 Black Men in Atlanta. Moore told them: 'I find myself among an epidemic number of women and children who are the victims of the black-on-black crime of economic spousal abuse. I realize it's a very sensitive issue, and I do approach it with compassion and with the desire to heal and not hurt.'"

(11) "'However, I find myself compelled to speak out in earnest against economic bondage, competitiveness, suppression, repression, oppression and physical, psychological and

verbal abuse. I have learned that it is a very widespread and increasing problem.' "

July 9, 1993 Article

(12) "Recently we told you about the nightmare split between singer Melba Moore and her ex-hubby music industry honcho, Charles Huggins. Melba told us that one day she went to her mailbox to discover that the man she'd been married to for many years, the man she was still living with in fact, had managed to divorce her without her even knowing that he'd ever visited a lawyer."

(13) "She maintained that he had someone else sign her name on the divorce papers."

(14) "Now, many months after the divorce, she's gotten another order of protection against Huggins, who, she's told us and a judge, was physically abusive to her."

(15) "In the court petition, Moore charged that Huggins uses 'vile and obscene language on the phone' to her and that he's accused her of 'teaching their 16-year-old daughter about being a lesbian.' "

(16) "She also contended that he's done everything he can to 'ruin her career' by saying negative things about her to potential employers."

(17) "Moore said she is near-destitute because the big-money management company she and Huggins started together was also, she claims, taken completely by Huggins."

(18) "Moore said that the same employee who signed the divorce papers (who had power of attorney for Moore) signed her name and gave all holdings in the company to Huggins without her knowledge."

The day before the third article was published, Moore filed a Family Court petition seeking an order of protection against Huggins. The petition alleged that plaintiff was harassing Moore with "almost daily" obscene phone calls; had accused Moore of teaching the couple's 16-year-old daughter "about being a lesbian"; had threatened to "ruin [Moore's] career"; and had caused Moore to "lose jobs" by making "negative" comments to potential employers. Upon the filing of the petition, an ex parte temporary order of protection was issued, which apparently was the basis for the almost simultaneous July 9 article. That petition and its subsequent history have some bearing on the present claims. Huggins was not served with a copy of the petition, or with a copy of the interim order, until July 26. The petition also stated that Huggins had accused

Moore of maintaining lesbian relationships. The petition further represented that Huggins' prior assaults had led to the prior issuance of a Criminal Court order of protection. Although only some of the statements in the petition were repeated or referenced in the articles, nevertheless, the very existence of the statements in the petition sheds some light on Moore's motivation. The Daily News' and Stasi's obligations to evaluate her credibility as a presumably biased source of damaging factual statements about the plaintiff, and the availability of simple means at their disposal to verify core statements made by Moore, albeit in a judicial setting, will be trial issues.

At the subsequent Family Court hearing, the court (Bruce Kaplan, J.) dismissed the petition. During the proceedings, Huggins' counsel specifically challenged the assertion of prior assaults and the existence of a prior Criminal Court order of protection issued against Huggins. The court focused specifically on the latter issue, noting in exasperation that it was a sworn statement, after which Moore's counsel retracted the statement, acknowledging that no prior Criminal Court order of protection was ever obtained. Family Court also surmised that Family Court was being used to serve "another agenda" in this case, noting the "resourceful reportage of a gossip column item and the date of the temporary order of protection strongly suggests that there are some credibility problems as well." These factors necessarily affect an evaluation of Stasi's reportage and whether she exercised any care in republication of factual statements made by a biased declarant.

Plaintiff commenced this action in July 1993 against Melba Moore, The Daily News and Linda Stasi by service of a verified complaint alleging that the three "Hot Copy" articles were defamatory. Although Moore was an original defendant, she was severed from the defamation action after filing for bankruptcy protection. Defendants-respondents Stasi and The Daily News invoke common-law and constitutional defenses to the claim of libel, including assertions that the statements were nonactionable opinion and, even if factual, that plaintiff's putative status as a public figure escalates the threshold of actionable libel to the constitutional standard of malice, which was purportedly unsatisfied. The IAS Court found the statements to consist of opinion, and on that basis granted defendants' cross motion for summary judgment and dismissed the complaint as against them without resolving the remaining issues. We find the determination by the motion court that certain statements complained of were nonactionable as expressions of opinion was in error.

Preliminarily, many of these itemized statements, though undoubtedly offensive to plaintiff and possibly even spurious in what they suggest, are not actionable. Others are protected to the extent that they fairly accurately reported a judicial proceeding (Civil Rights Law § 74). Yet others, though, despite the IAS Court's undifferentiated classification of all statements as opinion, clearly are actionable factual statements. The sheer number and inter-relatedness of these statements necessarily shapes our analysis.

The Court of Appeals, in a defamation action predicated on entire recitations of several broadcasts, noted that applying basic principles in a case such as this is not an easy task since "[o]bviously, not every word and assertion in the disputed articles is false or defamatory. * * * [M]any of the objective assertions made in this series of many thousand words are uncontroversial and are therefore not the proper subject for a defamation action" (*Gross v New York Times Co.*, 82 NY2d 146, 154). However, context, the very construct in which defendants take refuge, can also enhance the defamatory nature of remarks that might be less damaging in isolation (*cf.*, *generally*, Note, *Fact and Opinion in Defamation: Recognizing the Formative Power of Context*, 58 Fordham L Rev 761 [1990]).

The initial task is to distinguish between assertions of actionable statements of fact, and nonactionable statements of opinion. The Court of Appeals has noted that "[d]istinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task" (*Brian v Richardson*, 87 NY2d 46, 51). The necessary factors to be considered in making the distinction under both Federal and New York constitutional law are: (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion rather than fact (*Gross v New York Times Co.*, *supra*, at 153). Moreover, merely labeling a statement to be opinion does not, per se, insulate that statement from a defamation action. Rather, New York retains the common-law distinction between a putative statement of opinion that implies a basis in facts which are undisclosed to the reader and a statement of opinion accompanied by a recitation of facts on which the statement is based or that does not imply the ex-

istence of undisclosed facts. The former "opinion" is actionable because the reasonable reader could conclude that the opinion is based on actual facts detrimental to the plaintiff that are unavailable for the reader's own review. The latter opinion is nonactionable since it is more readily understood to be conjecture (*Gross v New York Times Co., supra* at 154; *see also, Alianza Dominicana v Luna*, 229 AD2d 328, *lv dismissed* 89 NY2d 1029). Speech "earns no greater protection simply because it is labeled 'opinion' " (*Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 243, *cert denied* 500 US 954, relying on *Milkovich v Lorain Journal Co.*, 497 US 1). However, seemingly factual assertions, because of the forum or the context, upon closer examination may well be "loose, figurative, or hyperbolic language" (*Milkovich v Lorain Journal Co., supra*, at 21). Nor may the news media rely on literalism, since the literal words of a challenged statement, shorn of context, neither immunize the statement nor confer a cause of action on a plaintiff. Rather, "courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person" (*Immuno AG. v Moor-Jankowski, supra*, at 243). Nor does the news media acquire a privilege solely because cautionary language, identifying a third party as the source, is utilized in conveying a factual statement (*Alianza Dominicana v Luna, supra*). However, the Court of Appeals disclaims a "hypertechnical parsing" of statements to find possible facts for purposes of maintaining a libel action (*Immuno AG. v Moor-Jankowski, supra*, at 256). Rather, the "core goal" of the inquiry must be placed in the context of "protect[ing] the individual's historic right to vindicate reputation without impairing" constitutional free speech (*Gross v New York Times Co., supra*, at 156; *see also, Immuno AG. v Moor-Jankowski, supra*, at 256).

■ Statements numbered 3, 4, 13, 14, 17 and 18 do cross the often indistinct line distinguishing possible fact from constitutionally protected speech. Although Stasi did qualify some of these statements in the articles as being based on statements made by Moore, it is well established that libelous statements do not become less libelous when they are repeated by a subsequent declarant; hence, respondents cannot insulate themselves, assuming falsity, by characterizing the repetition of a libel as legitimate reportage (*Alianza Dominicana v Luna, supra*) or by the expedient of attributing the statements to a source (*Hogan v Herald Co.*, 84 AD2d 470, *affd* 58 NY2d 630).

In statement number 3, Stasi restates Moore's factual assertion that her name was forged on tax returns and divorce

papers. In the context of the article, it is clear that Huggins is being accused of responsibility for the forgery. In any event, statement number 13 makes that implied fact explicit. There is no reasonable manner in which this statement can be construed to be mere opinion.

Next, in statement number 4, Stasi repeats Moore's statement that Huggins obtained the divorce by stealth so as to accomplish embezzlement. Embezzlement is a crime as well as a civil wrong. Initially, "there is simply no special rule of law making criminal slurs actionable regardless of whether they are asserted as opinion or fact" (*Gross v New York Times Co.*, *supra*, at 155). The mere fact that a plaintiff is accused of a crime does not, per se, make out a defamation claim; rather, the test is whether, in the particular context, the words convey as a fact that the plaintiff undertook a criminal act (*Gross v New York Times Co.*, *supra*, at 154). In some situations, the literal words indicating criminality may seem to convey factual information, yet, in context, they are not actionable insofar as the expression is hyperbolic or a rhetorical device (*see, e.g.*, *Greenbelt Publ. Assn. v Bresler*, 398 US 6, 14 [accusing real estate developer of " 'blackmail' ", while literally factual and accusatory, in context was only "rhetorical hyperbole, a vigorous epithet"]). The determinative consideration is whether the nature of the language and the particular setting would convey to the readership that no actual facts were being conveyed (*600 W. 115th St. Corp. v Von Gutfeld*, 80 NY2d 130, 140, *cert denied* 508 US 910). We have found a radio broadcast focusing on a particular audience, purporting to present news of interest to that community, to be defamatory when stating that former employees of a local relief organization had been sexually abused during their employment. Despite couching the report in terms suggesting something akin to rumor and gossip—that the story had been heard "on the street" and "they heard" the story—nevertheless, we concluded that listeners would discern factual content, and we reinstated the complaint (*Alianza Dominicana v Luna*, *supra*). The nature of the language and the media, print journalism, make an even more compelling case for defamation herein. The Court of Appeals' opinion in *Von Gutfeld* presents a contrast. There, a member of a condominium board of governors spoke at a public meeting concerning the board's opposition to the owner's application for a permit to maintain a sidewalk restaurant on the premises. On the basis of the Department of Consumer Affairs' misapprehension of facts, an approval had been granted. In that context, the declar-

ant, at a community board meeting, characterized the permit as being " 'fraudulent' " and that the entire transaction " 'smells of bribery and corruption.' " (*Supra,* at 135.) The permit was retracted after the community board voted to disapprove of it. The defamation action followed. Although the phrases on their face seemed actionably factual, the Court of Appeals found that the setting and the circumstances did not convey to the listeners that actual criminality had occurred.

The mitigating factors present in *Von Gutfeld*—that the discussion occurred in a public forum convened to discuss a matter of public importance—are not present in this case. What we are left with is a statement that, on its face, and in context with other related statements, conveys to readers that Huggins not only obtained a fraudulent divorce, but did so with the intention of embezzling Moore's assets, and, in fact, did steal Moore's interest in Hush Productions. What was the basis of Moore's interest in Hush? Here, too, facts are asserted. Statement number 4 states that they " 'started [it] together' " and that she had let Huggins manage the business. Statement number 17 also states that it was "taken completely by Huggins." Although that statement does not specify that the "big-money management company she and Huggins started together" was Hush, it was clearly implied and, in any event, statement number 4 makes the connection. How clear is Moore that the conveyance of all of her interests in Hush was theft, and not some other type of transaction? Statement number 18 makes clear that Huggins' employee who also forged the divorce papers forged her name and gave Huggins all of her holdings in the company "without her knowledge." The juxtaposition of these statements would convey to a reasonable person that facts indicating disreputable conduct by Huggins were being communicated. And, since Stasi in succeeding columns explicitly referenced prior columns—basically directing readers to follow the developing story—we reject any defense that factual assertions contained in different articles cannot be considered in juxtaposition. There was no reasonable basis upon which the IAS Court could simply dispose of these statements as constituting no more than mere opinion. Although there is some ambiguity created by reference to a power of attorney, that ambiguity does not dispel the clear imputation of theft to Huggins. But did Moore ever actually have a financial interest in Hush that could be stolen? According to her deposition in an action brought by entertainer Eddie Murphy against Hush, she did not. Hence, we have a clear factual statement

accusing Huggins of criminal and tortious conduct that, by definition, can be verified as truthful or not, and Moore's own sworn statement suggests that she, herself, was inconsistent in this regard. Resolution of where the falsity, if any, lay, though, is best left to a jury.

Next, Stasi states, without attribution to Moore in this part of the statement, that Moore has "gotten another order of protection against Huggins". Whether or not Moore secured an order of protection is a factual statement. It also conveys implication of a range of additional facts underlying the issuance of the order of protection. What is not communicated is that the Family Court order of protection was a temporary one issued the prior day, and that it was issued ex parte, and that plaintiff at that time had not even been served with it. Stasi's factual statement suggests that findings of abuse had been made pursuant to a Family Court proceeding that, in fact, had not been made. Even if the fact of an order of protection having been issued by Family Court was technically true, the truncating of that report conveys an implication that, in the absence of additional explanatory facts, takes on this underlying adverse factual dimension. However, even if we concluded that to that extent Stasi's statement was merely coy rather than defamatory, another fact, ultimately proved erroneous, also was conveyed—that there had been "another" order of protection founded on physical abuse. Juxtaposing these factual assertions communicates to a reasonable reader that judicial findings amounting to assault had been made against Huggins.

Other statements, though, when viewed in context, do not rise sufficiently above opinion to be actionable. For instance, statements numbered 5 through 11 would lead a reasonable reader to believe only that Moore was dissatisfied with the results of the New York divorce, and that she was disputing the adequacy of the payments being made pursuant to it. Although she speaks in terms of starvation, the over-all context is hyperbolic, and though she believes that Huggins is keeping her from working, that statement clearly is conjectural. While she believes herself to be a victim of "the black-on-black crime of economic spousal abuse," nowhere is it clear in that passage what, exactly, the statement means. Nor, in statement number 11, does she directly say that she was subjected to physical abuse, but only that she feels compelled to speak out about it, and has learned that it is widespread. These are not actionable statements.

Civil Rights Law § 74 provides in pertinent part: "A civil action cannot be maintained against any person, firm or corpora-

tion for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding". Civil Rights Law § 74 protects statement number 12, which basically says that the Pennsylvania divorce was a surprise to Moore, and publication of Moore's allegations in the Federal complaint that Huggins had obtained the Pennsylvania divorce by fraud. However, the Federal complaint alleges only that the fraud arose out of a jurisdictional impediment and was obtained without Moore's knowledge. Moore's Federal complaint does not allege that Huggins forged Moore's signature, so that the protection extended to fair reporting, while a defense to statements numbered 2 and 12, would not be a defense to statements numbered 3 and 13. The fair reporting privilege also protects statement number 15, but, for reasons noted above, not statement number 14. Moreover, statement number 14 never specifically referenced court documents and, in any event, truncated what the Family Court petition alleged, thereby not triggering section 74 protection.

Many of the statements set forth in the complaint, then, have precise meanings being communicated to Stasi's readership and are capable of being proved true or false.

■ Respondents herein also rely on the purported gossip context of the statements to minimize the reputational damage to Huggins. The *Gross* opinion made a distinction that the challenged statements in that case were placed in the news, rather than the Op Ed or editorial sections, insofar as the latter contexts would more easily suggest subjectivity, but the former conveys objectivity. *Immuno AG.* made a slightly different distinction, between letters to the editor and news reporting, the former "not published on the authority of the newspaper or journal." (*Supra,* at 252.) Defendants' point is that categorizing statements as gossip somehow detracts from the authoritativeness of the statements and, hence, minimizes the standard to which newspaper statements otherwise might be held. Defendants' reliance on a gossip context approaches the analysis from the wrong end. Unlike statements that are explicitly opinion (*e.g.,* "Op Ed"), statements made in what the defense describes as a gossip context do not gain some sort of immunity as pseudo-opinion simply because they are not hard news. To the contrary, these statements were presented as news, albeit less lofty than that in the front sections.

Finally, as noted in *Brian v Richardson* (87 NY2d 46, 52, *supra*), "an article's appearance in the sections of a newspaper that are usually dedicated to opinion does not automatically

insulate the author from liability for defamation. Despite our firm commitment to encouraging the robust exchange of ideas * * * we have never suggested that an editorial page or a newspaper column confers a license to make false factual accusations and thereby unjustly destroy individuals' reputations * * *. [T]he forum in which a statement has been made, as well as other surrounding circumstances comprising the 'broader social setting,' are only useful gauges for determining whether a reasonable reader or listener would understand the complained-of assertions as opinion or statements of fact."

Whether these statements address the need for public discussion of socially important issues which would elevate the standard of proof to one of gross irresponsibility (*Krauss v Globe Intl.*, 251 AD2d 191) turns also, inevitably, on what, at core, is being discussed, and whether it is of public or mere private importance. On that note, too, this case does not appear to involve other than a quintessentially private matter—the parties divorced, and signed a confidentiality agreement in that regard. "[E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention [citation omitted]. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants" (*Waldbaum v Fairchild Publs.*, 627 F2d 1287, 1296, *cert denied* 449 US 898). The mere fact that gossip is published does not elevate its subject to that of public concern (*Cottom v Meredith Corp.*, 65 AD2d 165, 170, *lv denied* 46 NY2d 711). The Supreme Court has frowned on the elevation of reportage of divorces to that of public concern, even if prominent people are involved and even if that factor may be of interest to the general public (*Time, Inc. v Firestone*, 424 US 448). As we have found elsewhere, "divorce * * * is no more than 'a private matter of public concern merely to gossips' " (*Krauss v Globe Intl.*, *supra*, at 192-193, quoting *Lorain Journal Co. v Milkovich*, 474 US 953, 964, n 9 [Brennan, J., dissenting]) and "not a public controversy" (*Krauss v Globe Intl.*, *supra*, at 193). The particular issues being communicated in the present case arise from the fact of a divorce, and do not address matters of public importance. There is some gloss in one of the columns, possibly tailored to provide some constitutional cover to what really is gossip, about what may be legitimate social problems. Defendants' appellate brief tries to make the most of connecting the statements to "economic spousal abuse," but the connection is specious as a defense to defamation. The divorce and

the business arrangements between the parties still remain essentially private affairs. Here, again, the analogy with *Alianza Dominicana (supra)* is instructive, in that we reinstated a complaint addressing matters having much more public importance to the particular audience than would the present matters have for Stasi's readership. The only connection made between the social context and the personal context in this case is that Stasi published Moore's claim, perhaps hyperbolic itself, that her experience somehow exemplified the broader social problem. But, as with the old adage, merely saying that it's so doesn't necessarily make it so, and certainly does not give cover, without more, to affirmative acts of reputational harm. Moreover, this putative social context, if anything, accentuates the statements that Huggins perpetrated fraud and physical abuse against Moore.

Nevertheless, the IAS Court, in a decision as sweeping as it was brief, found all of the challenged statements to be opinion. There was no sound basis for the IAS Court to reduce these factual statements in toto to the realm of mere subjective opinion or conjecture.

■ Defendants contend that even if some of the statements are actionable, that Huggins, as a general purpose public figure, must satisfy the constitutional burden, by clear and convincing evidence, of demonstrating that defendants published the statements with " 'actual malice' " (*New York Times Co. v Sullivan*, 376 US 254, 280; *cf., Gertz v Robert Welch, Inc.*, 418 US 323, 352). However, the premise is incorrect because Huggins is not a public figure. Therefore, that standard must yield to the standard applicable to press reports concerning a private figure.

A "general purpose" public figure is a person "who has obtained 'general fame or notoriety in the community, and pervasive involvement in the affairs of society' " (*Krauss v Globe Intl., supra*, at 192, quoting *Gertz v Robert Welch, Inc., supra*, at 352). Even a person who had been a public figure does not retain that status unless he or she "maintain[s] regular and continu[ed] access to the media" (*Lerman v Flynt Distrib. Co.*, 745 F2d 123, 137, *cert denied* 471 US 1054). In *Krauss*, the plaintiff was the husband, but also the producer and promoter, of television personality Joan Lunden, circumstances that have a direct bearing on our present analysis. The plaintiff sued in connection with a media report of his purported wrongdoing while separated from his wife. In *Krauss (supra,* at 192), we found that "[p]laintiff was not famous in his own right,

and his marriage * * * certainly did not bestow upon him the sort of fame that is necessary to be considered a general public figure."

In comparison, a "limited purpose" public figure is one who "voluntarily injects him or herself into a public controversy with a view toward influencing it" (*Krauss v Globe Intl., supra,* at 192, citing *Gertz v Robert Welch, Inc., supra,* at 351; *Samuels v Berger,* 191 AD2d 627, 630). However, in order to attain that status, the public controversy " ' "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way" ' " (*Krauss v Globe Intl., supra,* at 192, quoting *Foretich v Capital Cities/ABC,* 37 F3d 1541, 1554). Returning to *Krauss,* we note our further finding that the husband/producer was not a limited purpose public figure on the basis of the subject matter of the story. Since we found divorce to be essentially a private, and not a public matter, the media defendants were required to provide a "viable rationale that would transform the subject matter of their article from mere gossip to public controversy" (*supra,* at 193). There, as here, they failed to do so. In *Krauss,* as here, the attempt to wrest some public-sounding values from the fact of the divorce dispute was "strained" and "their attempt to argue from that portrayal * * * relevan[ce] to a public controversy [is] simply not borne out . * * * [T]here is no basis to find that he ever sought, or achieved, a meaningful level of public attention for himself" (*supra,* at 193). Rather, any degree of public interest in that plaintiff arose because of his marriage to a celebrity and not from the attributes with which the article was saddling him. Similar reasoning compels our present conclusion that Huggins, despite his personal business arrangements and successes, and even considering that the business was to promote celebrities, had not sought publicity for himself personally. In this vein, we reject defendants' reliance on a limited number of articles in a niche market, referring to Huggins, as a means to argue Huggins' own celebrity status; interestingly, defendants have not relied on any articles about Huggins in their own publication, The Daily News, placing in doubt the contention that he is famous to their readership. Nor can defendants rely on the public attention generated by these articles to argue his fame, insofar as "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure" (*Hutchinson v Proxmire,* 443 US 111, 135).

Since plaintiff is not a public person and the matters publicized were not of public concern, defendants are held to

New York's negligence standard (*Gertz v Robert Welch, Inc.*, 418 US 323, *supra*; *Krauss v Globe Intl.*, *supra*). This record precludes awarding defendants summary judgment on the basis that plaintiff failed to meet the evidentiary standard. This matter requires trial.

Accordingly, the order of the Supreme Court, New York County (Elliott Wilk, J.), entered March 13, 1997, denying plaintiff's motion for, *inter alia*, partial summary judgment and granting defendants-respondents' cross motion for summary judgment dismissing the complaint, should be modified, on the law, defendants-respondents' cross motion denied and the complaint reinstated to the extent indicated herein, and plaintiff's motion for partial summary judgment dismissing the third and fourth affirmative defenses granted, the matter remanded for further proceedings, and otherwise affirmed, without costs.

NARDELLI, J. P., RUBIN and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered March 13, 1997, modified, on the law, defendants-respondents' cross motion denied and the complaint reinstated to the extent indicated in this Court's opinion, and plaintiff's motion for partial summary judgment dismissing the third and fourth affirmative defenses granted, the matter remanded for further proceedings, and otherwise affirmed, without costs.