[No. A104918. First Dist., Div. Four. Aug. 11, 2005.]

KHADIJA A. GHAFUR, Plaintiff and Appellant, v.
JONATHAN BERNSTEIN et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.C.

COUNSEL

Brian Beckwith for Plaintiff and Appellant.

Ropers, Majestki, Kohn & Bentley, Susan H. Handelman and Terry Anastassiou for Defendants and Respondents.

## OPINION

KAY, P. J.—Plaintiff and appellant Khadija A. Ghafur sued defendants and respondents the Anti-Defamation League of B'nai B'rith (ADL), ADL's Regional Director, Jonathan Bernstein, and ADL's Regional Board Chair, Gil Serota, for libel for statements in a letter from Bernstein and Serota on behalf of the ADL to former State Superintendent of Public Instruction Delaine Eastin urging an investigation into plaintiff's links to an Islamic terrorist organization, and a suspension of public funding for the charter school system plaintiff managed. This is an appeal from an order granting defendants' motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) law (Code Civ. Proc., § 425.16) and from the resulting judgment against plaintiff.

In the published portion of the opinion, we hold that the alleged libel pertained to plaintiff's role as a public official, and we explain why that conclusion, and the one we draw in the unpublished portion of the opinion—that there is no clear and convincing evidence defendants acted with actual malice in making the challenged statements—are dispositive in defendants' favor. We affirm the order and judgment.

## I. BACKGROUND

Prior to January 16, 2002, plaintiff was the superintendent of the Gateway Academy public charter schools (Gateway) chartered by the Fresno Unified School District (FUSD). According to December 20, 2001, and January 2, 2002, articles in the Fresno Bee, Gateway opened three sites in September 2000 and thereafter became the fastest growing network of charter schools in California, which at its peak operated 14 schools for about 1,000 students from the Bay Area to Southern California.

A December 17, 2001, article in the San Francisco Chronicle reported that students at the Gateway school in Sunnyvale were paying tuition, studying Islam in class, and praying with their teachers. Plaintiff denied being aware of the situation at the Sunnyvale school, and severed Gateway's ties with the school the day after she was contacted by the Chronicle.

The January 2, 2002, Fresno Bee article said that Gateway was being investigated by law enforcement agencies and might soon lose its charter. The investigations were apparently focused on Gateway's spending, school sites, and parent corporation, which was founded by plaintiff. State Superintendent of Public Instruction Delaine Eastin was threatening to cut off Gateway's funding if allegations about teaching religion at certain of its sites and charging tuition were not answered. Although Gateway received about $1.1 million in state funds in the preceding academic year, and $672,900 in state funds along with a private loan of $630,000 in the 2002 academic year, it was reporting an indebtedness of $1.3 million. The FUSD had asked Gateway to submit an itemized account of its spending and explain its $1.3 million debt. The article said that if adequate information was not provided by the following Friday, Marilyn Shepard, head of FUSD's charter school department, would ask the FUSD board to terminate Gateway's charter. Plaintiff thought that Gateway was in the spotlight because of "fears and rumors about Muslims" following the September 11, 2001, terrorist attacks, but FUSD officials said that their concerns were legitimate and that Gateway "wasn't being treated unfairly because some members are Muslim."

On January 10, 2002, the ADL under defendants Bernstein's and Serota's signatures sent the letter to Delaine Eastin that is the subject of this lawsuit.

The letter called for an immediate suspension of Gateway's funding, and urged an investigation of religious instruction in Gateway schools, and of Gateway's link to an Islamic terrorist organization called Al-Fuqra. The letter referred accurately to news reports stating that plaintiff was an officer of "Muslims of the Americas," that Muslims of the Americas was a corporate front for Al-Fuqra, and that members of Al-Fuqra had committed murders and bombings in the United States. The letter described Muslims of the Americas as "a virulently anti-Semitic, Islamic extremist group."

Gateway's charter was terminated by the FUSD on January 16, 2002, because of fiscal mismanagement, failure to obtain fire marshal approval for facilities, and failure to obtain criminal background clearances for employees. According to the declaration of FUSD official Shepard, the ADL's January 10, 2002, letter to Eastin was not presented to or considered by the FUSD in connection with the charter revocation. She had recommended revocation of the charter, and a vote on the revocation had been scheduled, before the letter was sent.[1] At some point after Gateway's charter was revoked, the ADL posted the letter on its Web site.

Plaintiff's complaint for libel alleged that the Eastin letter was maliciously false and defamatory in stating that plaintiff was an officer of a virulently anti-Semitic Islamic extremist group, and in linking plaintiff, Gateway, and the Muslims of the Americas to a terrorist organization.

In support of their motion to strike, defendants submitted the above-referenced news articles, and many others detailed below in our discussion of the malice issue, that documented the activities of Al-Fuqra, and the link between Al-Fuqra and Muslims of the Americas. Defendants also submitted Nevada Secretary of State records showing plaintiff as the secretary of a corporation called "Muslims of America, Inc."

Plaintiff submitted a declaration in opposition to the motion stating that she had been a practicing Muslim since 1971, and that she was not anti-Semitic. To her knowledge, Muslims of the Americas, Inc. had never sponsored or supported violence or terror. She had worked with women's groups in conjunction with Muslims of the Americas, Inc. on "refugee outreach, educational programs and social service activities," but had never been an officer or employee of that corporation. She had been secretary of a "wholly different and unrelated Nevada non-profit corporation, Muslims of America, Inc.," which never conducted any business or served as a front for any individual or entity. She believed that defendants were aware of the difference between the two corporations, and knew in January 2002 that she was not an

---

[1] Plaintiff does not contend that the letter played any role in the charter's revocation.

officer of Muslims of the Americas, Inc. because they had been tracking that organization since the 1980's.

In its statement of decision on the granting of the motion to strike, the court found that plaintiff's libel claim was subject to the anti-SLAPP law because the transmission of the January 10, 2002, letter to Superintendent Eastin, and the posting of the letter on ADL's Web site, were "protected First Amendment conduct." The court concluded that plaintiff could not demonstrate a probability of prevailing on her claim because sending the letter to Eastin was privileged under Civil Code section 47 (hereafter section 47), subdivision (b), and posting the letter on the Web site was privileged under section 47, subdivision (d). Alternatively, the court found that plaintiff had no probability of prevailing because she was a limited purpose public figure, and "may [also] be considered" a public official, with respect to the statements at issue, and there was insufficient evidence that the allegedly false statements in the letter were made with actual malice.

## II. DISCUSSION

A. *Arguments Raised*

■ In ruling on a motion to strike, the court must first decide whether the defendant has shown that the challenged cause of action arises out of activity protected under the anti-SLAPP law; if that showing is made, the court must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) It is not disputed that plaintiff's libel claim arises out of acts "in furtherance of [defendants'] right of petition or free speech under the United States or California Constitution in connection with a public issue" (Code Civ. Proc. § 425.16, subd. (b)(1)), and thus satisfies the first prong of the anti-SLAPP test. The issue is whether plaintiff has established a probability of prevailing on the claim.

■ It is conceded that the letter in question was privileged insofar as it was communicated to Superintendent Eastin. The letter sought a suspension of funding for Gateway, and asked for an investigation of ADL's allegations against Gateway and plaintiff. "A communication to an official agency which is designed to prompt action" (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1439 [114 Cal.Rptr.2d 69]) is deemed part of an official proceeding for purposes of section 47, subdivision (b), which provides that a publication made in any "official proceeding authorized by law" is privileged. (See *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 362–364 [7 Cal.Rptr.3d 803, 81 P.3d 244] [citing and discussing numerous cases applying this privilege "to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing"].)

Plaintiff contends that she can nevertheless prevail on her libel claim based on the posting of the letter on ADL's Web site. She submits that this public broadcast of the letter, unlike the original letter itself, was not privileged. (See *King v. Borges* (1972) 28 Cal.App.3d 27, 34 [104 Cal.Rptr. 414] [absolute privilege covering letter to Division of Real Estate alleging realtor's malfeasance did not extend to copies of letter distributed to persons outside the state agency].) Defendants maintain that the Web site posting was privileged under section 47, subdivision (d)(1)(C) and (D), which protects fair and true reports in a "public journal" of anything said in the course of a public official proceeding. Defendants argue that ADL's Web site, like a newspaper, magazine, or television broadcast (see *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1558 [1 Cal.Rptr.3d 245]; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 246 [83 Cal.Rptr.2d 677]; *Green v. Cortez* (1984) 151 Cal.App.3d 1068, 1073 [199 Cal.Rptr. 221]), qualifies as a "public journal" because the ADL has been judicially recognized as an entity that engages in journalistic activity (see *Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1092–1093 [79 Cal.Rptr.2d 597] [noting also, however, that many of ADL's activities "are unrelated to conventional journalism"]).

Alternatively, defendants argue that plaintiff cannot establish a probability of prevailing because she was either a limited purpose public figure, or a public official, in connection with the alleged libel, and there is no clear and convincing evidence that the challenged statements were made with actual malice, as required by the *New York Times* (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279–280 [11 L.Ed.2d 686, 84 S.Ct. 710]) rule. We conclude that plaintiff was a public official, and that she has not established the requisite malice to prevail on her libel cause of action. In view of these conclusions, we need not decide whether plaintiff was a limited purpose public figure, and we need not address defendants' claim of privilege under section 47, subdivision (d).

B. *Whether Plaintiff Was a Public Official*

██ To recover for defamation relating to their official conduct, public officials must show that the statements were made with knowledge of their falsity or reckless disregard for their truth. (*New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279–280.) This rule extends to "anything which might touch on an official's fitness for office." (*Garrison v. Louisiana* (1964) 379 U.S. 64, 77 [13 L.Ed.2d 125, 85 S.Ct. 209].) The rule reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times Co. v. Sullivan, supra,* 376 U.S. at p. 270.) Public

officials are held to a different rule than private individuals because they assume a greater risk of public scrutiny by seeking public office, and generally have greater access to channels of effective communication to rebut false charges. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344 [41 L.Ed.2d 789, 94 S.Ct. 2997].)

█ Whether someone is a "public official" for this purpose is determined according to federal standards. (*Rosenblatt v. Baer* (1966) 383 U.S. 75, 84 [15 L.Ed.2d 597, 86 S.Ct. 669]; *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1610 [284 Cal.Rptr. 244].) Under those standards, "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." (*Rosenblatt v. Baer, supra,* 383 U.S. at p. 85, fn. omitted.) The designation applies where the individual's "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all governmental employees . . . ." (*Id.* at p. 86.) "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." (*Id.* at p. 86–87, fn. 13.)

Who qualifies as a "public official" has been litigated in many cases throughout the country (see Annot. (1996) 44 A.L.R.5th 193 [collecting decisions]), and the issue has arisen a number of times in California. Under our precedents, a child welfare worker (*Kahn v. Bower, supra,* 232 Cal.App.3d at p. 1613), a police officer (*Gomes v. Fried* (1982) 136 Cal.App.3d 924, 934 [186 Cal.Rptr. 605]), and a former city attorney and lawyer for a city redevelopment agency (*Weingarten v. Block* (1980) 102 Cal.App.3d 129, 139 [162 Cal.Rptr. 701]) have been found to be public officials. A public school teacher (*Franklin v. Benevolent Etc. Order of Elks* (1979) 97 Cal.App.3d 915, 924–925 [159 Cal.Rptr. 131]), and a shareholder and director of the parent company of an association licensed to conduct horse racing at a county fairgrounds (*Mosesian v. McClatchy Newspapers* (1988) 205 Cal.App.3d 597, 611 [252 Cal.Rptr. 586]) have been held not to be public officials. There is a split of authority as to whether a deputy public defender should be regarded as a public official. (Compare *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 10–11 [20 Cal.Rptr.2d 890], and *Tague v. Citizens for Law & Order, Inc.* (1977) 75 Cal.App.3dSupp. 16 [142 Cal.Rptr. 689].)

Consistent with the federal nature of the applicable standards, precedents from other jurisdictions have been cited as persuasive authority in the

California cases. (E.g., *Kahn v. Bower, supra,* 232 Cal.App.3d at pp. 1612–1613; *Gomes v. Fried, supra,* 136 Cal.App.3d at pp. 933–934; *Weingarten v. Block, supra,* 102 Cal.App.3d at p. 140.) There is disagreement among jurisdictions as to whether public school principals and teachers are to be considered public officials. (See Annot., *supra,* 44 A.L.R.5th at pp. 318–332 and cases cited; see also *Franklin v. Benevolent Etc. Order of Elks, supra,* 97 Cal.App.3d at pp. 924–925.) However, there is apparently universal agreement that public school superintendents and board members merit that designation. (*Garcia v. Bd. of Ed. of Socorro Consol. Sch. Dist.* (10th Cir. 1985) 777 F.2d 1403, 1408 [school board members are public officials]; *Strong v. Oklahoma Pub. Co.* (Okla. Civ. App. 1995) 899 P.2d 1185, 1188 [school board vice-president is public official]; *Scott v. News-Herald* (1986) 25 OhioSt.3d 243 [25 Ohio B. 302, 496 N.E.2d 699, 702–703] [superintendent of municipal public school system]; *State v. Defley* (La. 1981) 395 So.2d 759, 761 [school superintendent and "school supervisor"]; *Palm Beach Newspapers, Inc. v. Early* (Fla. Dist. Ct. App. 1976) 334 So.2d 50, 51 [county superintendent of public instruction].)

Whether public school board members and superintendents qualify for public official status has not been considered a close question. "Clearly, the governance of a public school system is of the utmost importance to a community, and school board policies are often carefully scrutinized by residents. Members of the local school board, who are elected to make decisions regarding local education, clearly 'have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.' *Rosenblatt* [*v. Baer, supra,* 383 U.S. at p. 85]. The strong public interest in ensuring open discussion of their job performance warrants the conclusion that school board members are public officials." (*Garcia v. Bd. of Ed. of Socorro Consol. Sch. Dist., supra,* 777 F.2d at p. 1408; see also *Strong v. Oklahoma Pub. Co., supra,* 899 P.2d at p. 1189 [school board vice-president "clearly" meets the test for public official status].) The same reasoning applies equally to an unelected public school superintendent: "Clearly, the head of a city school district has substantial responsibilities in the operation of the system. Moreover, the [city's] public has a substantial interest in the qualifications and performance of the person appointed as its superintendent. [¶] . . . Controversial actions of a public school superintendent constitute major news in the local paper. A contrary finding [to that of public official status] would stifle public debate about important local issues." (*Scott v. News-Herald, supra,* 496 N.E.2d at pp. 702–703.)

The reasoning of these cases is persuasive here. Plaintiff was the superintendent of what was described at the time as the fastest growing charter school system in the state. At their peak, the Gateway charter schools were educating 1,000 students. They had received over a $1 million in public funds for their operation, and stood to receive millions of dollars more. Insofar as it

appears from the record, plaintiff was the primary, if not sole, spokesperson for these schools, and the one in charge of their management. In that capacity she had "substantial responsibility for or control over the conduct of governmental affairs," and her position was one of sufficient importance to "invite public scrutiny and discussion . . . entirely apart from the . . . particular charges in controversy." (*Rosenblatt v. Baer, supra,* 383 U.S. at pp. 85–87, fn. 13.) "[E]ducation is perhaps the most important function of state and local governments." (*Brown v. Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 74 S.Ct. 686].) Public schools are "the Nation's most important institution 'in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests.' " (*Lorain Journal Co. Et Al. v. Milkovich* (1985) 474 U.S. 953, 958 [88 L.Ed.2d 305, 106 S.Ct. 322], cert. den. (dis. opn. of Brennan, J.).) Thus, there was manifestly a strong public interest in open discussion of plaintiff's job performance and fitness for the position.

Plaintiff contends that she cannot be considered a public official under *New York Times* because as a superintendent of charter schools, she was not a governmental employee. This argument is based on *Mosesian v. McClatchy Newspapers, supra,* 205 Cal.App.3d 597, the case that considered whether a man with an interest in an association licensed to manage horseraces was a public official. In concluding that he was not, the court first found that he could not be a public official because he was not a government employee. (*Id.* at p. 609.) Although the court said it did not believe that public official status could be based merely on the performance of a public or governmental function (*id.* at p. 607), it then went on to note that horse racing is not a government business in California (*id.* at p. 610). Despite the reasoning of this decision, we do not consider government employment a dispositive factor in resolving the issue of public official status here.

■ Charter schools have been broadly described as "statutorily created schools run by private parties" (Note, *Exploring 'Unchartered' Territory: An Analysis of Charter Schools and the Applicability of the U.S. Constitution* (1998) 7 S. Cal. Interdisc. L.J. 133), and as entities that may in some respects blur the distinction between public and private institutions for constitutional law purposes ( *id.* at pp. 150–165 [discussing whether charter schools can be considered government agencies]; see also Wren, *Charter Schools: Public or Private? An Application of the Fourteenth Amendment's State Action Doctrine to These Innovative Schools* (2000) 19 Rev. Litig. 135). However, it is clear that California charter schools are part of this state's public school system. This was one of our holdings in *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1136 [89 Cal.Rptr.2d 745], where we rejected state constitutional challenges to California's charter school laws, and the argument that charter schools are private, not public schools (*id.* at p. 1139). We also rejected the contention that charter officials were not

officers of the public schools. We held to the contrary that, under the laws of this state, "charter school officials are officers of public schools to the same extent as members of other boards of education of public school districts." (*Id.* at p. 1141.)

■    We likewise conclude here that plaintiff, as the superintendent of a charter school system, was, like other public school superintendents and board members, a public official under *New York Times*, whether or not she was strictly speaking a governmental employee in that capacity. A contrary conclusion would exalt form over substance, overlook "the intent of the Legislature that charter schools are and should become an integral part of the California educational system" (Ed. Code, § 47605, subd. (b)), and derogate the First Amendment protection of open discussion of the performance and qualifications of those with "substantial responsibility for or control over the conduct of governmental affairs" (*Rosenblatt v. Baer, supra,* 383 U.S. at p. 85).

This result is consistent with the only case we have found where a First Amendment issue has arisen in the context of a charter school. In *Nampa Charter School, Inc. v. DeLaPaz* (2004) 140 Idaho 23 [89 P.3d 863], a defamation action by a charter school against a bookkeeper it had fired, the school alleged that the bookkeeper was intentionally making false statements to induce the school district to revoke the school's charter. The school argued that, as a nonprofit corporation, it had the same powers as any individual to sue or be sued. The court concluded, however, based on the state laws governing the charter school, that the school "should be treated similarly to a school district" (*id.* at p. 868), and thus as "a governmental entity, at least within the context of this case" (*ibid.*). Since *New York Times* and *Rosenblatt v. Baer, supra,* 383 U.S. 75, "held that a generalized criticism of government policy cannot be punished," the charter school was barred from suing for defamation. (*Nampa Charter School, Inc. v. DeLaPaz, supra,* at p. 867.) Moreover, the school could not obtain an injunction preventing the teacher from making unfounded false statements about the school's administrators because such relief would be "an impermissible prior restraint on speech that is critical of *public officials*." (*Ibid.,* italics added.)

Accordingly, plaintiff was a public official for purposes of the *New York Times* rule.

C. *Whether Defendants Acted With Actual Malice**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante*, page 1230.

## III.  DISPOSITION

The order granting the motion to strike, and the judgment for defendants, are affirmed.

Reardon, J., and Rivera, J., concurred.