Filed 2/26/13  Jacobsen v. Palamdale School Dist. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LYNETTE JACOBSON, | B239582 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MC022822) |
| v. | |
| PALMDALE SCHOOL DISTRICT et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Randolph A. Rogers, Judge.  Reversed and remanded with directions.

Carpenter, Rothans & Dumont, Justin Reade Sarno and Louis R. Dumont for Defendants and Appellants.

Law Office of Brian E. Reed and Brian E. Reed for Plaintiff and Respondent.

# INTRODUCTION

Lynette Jacobson (Jacobson) is a third grade teacher at Ocotillo Elementary School in the Palmdale School District (District). Roger Gallizzi (Gallizzi) is the Superintendent of the District. At a public meeting of District's Board of Trustees (Board), Jacobson spoke (as did three other individuals) against a proposed change to District's field trip policy.

Three months later at the beginning of the school year, Gallizzi delivered a "Welcome Back" message to District's teachers, staff, students and parents in which he expounded upon the theme that an educator's primary responsibility is to create a learning environment for the students. In that context, Gallizzi referred to four incidents in which he believed teachers had acted unprofessionally. He gave, as one example, Jacobson's remarks from Board's public meeting, comparing her attitude to that held by Scar, a character in "The Lion King."

Jacobson sued Gallizzi and District (collectively defendants), alleging that Gallizzi's remarks were, among other things, defamatory. Defendants moved to strike Jacobson's complaint pursuant to section 425.16.[1] Their anti-SLAPP motion[2] urged that the gravamen of Jacobson's complaint arose out of Gallizzi's constitutionally protected communications on issues of public interest and that Jacobson could not demonstrate a probability of prevailing on her action. The trial court denied the motion, finding that defendants had failed to demonstrate that Gallizzi's "Welcome Back" message was made in furtherance of his constitutional right to free speech.

---

[1] All undesignated statutory references are to the Code of Civil Procedure unless noted to the contrary.

[2] "SLAPP" is an acronym for "strategic lawsuit against public participation." (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

This defense appeal follows. First, we find that Gallizzi's message addressed issues of public interest: the goal of public education, the role teachers play in reaching that goal, and District's new field trip policy. Second, we find that Jacobson failed to demonstrate a probability of prevailing on her claims because Gallizzi's message was subject to the absolute privilege accorded statements made by a government official in proper discharge of his official duties. (Civ. Code, § 47, subd. (a) (hereafter section 47).) We therefore reverse the trial court's order and direct it to grant the special motion to strike, to dismiss the complaint with prejudice, and to award attorney fees to the defense.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts Underlying Jacobson's Lawsuit*[3]

As Superintendent, Gallizzi is responsible for District's overall operations. This includes overseeing the day-to-day management of District and "ensuring that all operations of the district are designed to provide rigorous academic challenges and rigorous expectations of student achievement, facilitating the success of each student." In addition, he "maintain[s] and lead[s] an appropriate community and media relations program" and, "as part of [his] official duties," he "respond[s] to comments or criticisms from parents, teachers, administrators, or other community members."

According to Gallizzi, the subject of school field trips had "been a topic of concern and conversation in the community for several years." The issues include the cost and funding of the trips, the educational value of the trips, and "the equity or inequity of the number of field trips that certain schools were taking in the

---

[3] These facts are gleaned from Jacobson's complaint and the evidence offered in regard to the motion to strike.

3

district compared to others." In regard to the latter concern, Gallizzi had "sought feedback from the various school sites and PTA groups, as well as members of the community." Gallizzi's Advisory Committee (the Committee) had discussed the issue several times. The Committee, comprised of members of the Parent Teachers Association and "a parent representative from the school community," "provides input to [Gallizzi's] office and the Board of Trustees, which assists [their] efforts in shaping policy for the school district." By June 2010, the Committee recommended to the Board "to curtail the number of field trips since an equitable solution could not be reached."

On June 15, 2010, the Board conducted a public meeting that Gallizzi attended. Towards the end of the meeting, several individuals asked to address the Board about "non-agenda items." One such item was the Committee's proposed change to the field trip policy. One parent, one student, and two teachers (one of whom was Jacobson) spoke against the proposal.

Jacobson identified herself as "a community member, tax payer, parent, child advocate, and lastly a teacher [at Ocotillo Elementary School] in the Palmdale School District." She stated that she was concerned about District's "recently announced policy" "to cancel almost all field trips for the coming school years, regardless of funding source." According to Jacobson, two rationales for this change had been advanced: inadequate funding at some schools and "fairness." After explaining how she believed adequate funding could be assured, Jacobson stated:

> "More pressing, the issue of fairness has risen as the second obstacle to field trips in [our District]. *Let's just state up front, life isn't fair.* It wasn't fair that for several years [our] District has had some failing schools. It isn't fair that schools may now apply for million dollar grants that, if granted, will bring tremendous resources to only those schools. Grants by their very nature are not fair. Two of

4

my students went to the District Spelling Bee. One received the word judiciary, while the other had to spell glimpse. Not so fair?

"The bottom line is that our country has been built on hard work and determination. Americans have always worked hard for what they achieve, and a sense of fulfillment is derived from reaching a goal. Isn't that one of the basic values we try to instill in our students? Hard work will get you ahead, as opposed to waiting around for someone to hand you something.

"Teachers, parents, and students work hard to raise money for such field trips at Ocotillo [Elementary School]. Yes, we do have some PTA fund raisers. We make requests for support from local businesses. Each year Supervisor Antonovich donates money to our school. But . . . we have to put the work into asking. We have teachers who have collected plastic bags, and we recycle at Ocotillo.

"I would be more than happy to share any of these ideas with colleagues." (Italics added.)

Jacobson ended by explaining the benefits of field trips.[4]

After the four speakers had concluded their remarks, Board's President (Mark Gross) "directed" "Gallizzi and staff to give due consideration to the comments."

Gallizzi convened a meeting of the Committee. According to Gallizzi, "after due consideration and diligence was given to the matter, it was determined that the best course of action for the school district was to pare back the number of field trips in order to ensure greater equality for all of our students."

At the beginning of the 2010-2011 school year, Gallizzi authored a "Welcome Back" message. The message was a mission statement that, among other things, "communicated [the] decision" to change the field trip policy. The

---

[4]     Jacobson's remarks were recorded in the minutes of Board's meeting.

message was distributed on a DVD that all teachers were required to watch. 950 teachers heard the DVD. In addition, Gallizzi's message was "published and circulated" "to the entire group of employees of the Palmdale School District as well as many parents and students."

Gallizzi's annual message addressed District's responsibility to create a learning environment for students. His theme was "Learning for all, every child, every day." (Capitalization omitted.) He explained: "When it comes to student learning, we can't sit back and do nothing. That is the moral imperative, that is our moral responsibility." After elaborating on his theme, Gallizzi stated that he felt "compelled to share some very unprofessional remarks and actions [he] witnessed [from teachers] in the past year" that he believed were contrary to or undermined District's duty to create a learning environment for all students. First, Gallizzi read a message that he had received from the leadership team at one school that stated: "We do not believe it is our job to create student learning." Next, Gallizzi said that he had "heard a group of teachers in a meeting blame only students for low test scores." After that, he explained that he had "heard a teacher, in a staff meeting say that expecting learning for all at high levels is like trying to teach Mandarin to a cafeteria bench." Gallizzi stated: "I know that this is not how most of us think. But what is troubling is that to both of these outbursts no one responded. No one said anything. I am confident that the room full of professionals was shocked into silence at the statements and this was not a silence in agreement." Lastly, Gallizzi turned to the controversy surrounding District's field trip policy. He stated:

> "Finally, while trying to discern the proper approach to the dilemma of the equity situation regarding field trips, my Cabinet and I approached this from a point of view where everyone would be on a level playing field. Some schools have 20 times more field trips than others. Public education is not a place for haves and have nots. It is the great social equalizer in the words of Horace Mann. Much to our surprise, that is not how some felt. *At a board meeting, staff came to*

6

*the podium and basically said, like the character Scar in The Lion King that life is not fair, and those children and parents at those schools need to be taught that lesson and should also be taught to work harder.* It makes me wonder that, if they felt comfortable enough to say that in a public forum, then what do they say in the staff lounge, and what do they feel in their hearts? *Field trips are opportunities for learning and there cannot be an opportunity gap in public education.* Oh, and all of us in the board room were *silent* and I take responsibility and publicly apologize for that. [¶] We need to reflect as professionals why we remain silent to such sentiments. . . . [¶] This is the place to be if you believe in learning for all." (Most italics added, boldface omitted.)

## 2. *Jacobson's Lawsuit*

In August 2011, Jacobson filed suit against Gallizzi and District based upon the contents of the "Welcome Back" message.[5] She alleged causes of action for libel, slander, intentional infliction of emotional distress, invasion of privacy, and improper retaliation for having exercised her First Amendment rights. In pertinent part, she alleged:

"Defendant Gallizzi, in essence, published the statement that led those who read, saw and heard his videotaped 'welcome' speech, to believe that [Jacobson] was telling students and parents that it was their fault there were not going to be any field trips because they needed to work harder. Defendant Gallizzi likened [Jacobson] to 'Scar' from The Lion King and went on to explain that conduct like [Jacobson's] was unacceptable and troubling."

"However, by what defendant Gallizzi said to literally hundreds of individuals, it was clear that he was retaliating against [Jacobson] by referring to her as a character in a popular movie, a character that was cruel, heartless and unsympathetic."[6]

---

[5] Prior to initiating the lawsuit, Jacobson filed a Tort Claim which District denied.

[6] In her opposition to the special motion to strike, Jacobson summarized the Wikipedia entry about Scar as follows. Scar was "a psychotic character concerned with

Jacobson sought compensatory and punitive damages.

3. *The Special Motion to Strike*

Citing section 425.16, defendants moved to strike Jacobson's complaint. The defense evidence included the minutes of Board's June 15, 2010 meeting, a declaration from Gallizzi, and a transcript of his "Welcome Back" message.

Jacobson's opposition included declarations from three teachers, each of whom averred that they recognized Jacobson as the individual referred to in Gallizzi's message and were shocked by his comments. A declaration from Jacobson explained her position on field trips and opined at length about Gallizzi's motive and intent in referring to her in the "Welcome Back" message. Jacobson also furnished a transcript of her June 15, 2010 remarks at Board's meeting and a Wikipedia entry about Scar. (See fn. 6, *supra.*) Lastly, Jacobson tendered copies of District's civility policy and an administrative regulation, both of which Jacobson claimed that Gallizzi had violated.

---

gaining power and would kill anyone he saw as competition. Scar plotted the murder of his own brother and nephew and followed through with little remorse. Scar was a narcissist and is most likely an archetype of King Claudius, the villain from <u>Hamlet</u> and was inspired by the real life German dictator, Adolf Hitler. In the song 'Be Prepared,' in which Scar sings to the hyenas about how he will kill Mufasa (his brother) and become King, there is a scene where Scar sits on a high up rock watching the hyenas march along. This is very similar to the Nazi film, <u>Triumph of the Will</u>.

"Scar pushes his brother off a cliff to his death in order to become King and uses the same tactic on his nephew, Simba."

Jacobson concluded: "The point is that by equating [me] to being Scar, Defendant Gallizzi was saying [I] was a vile, despicable person."

## 4. *The Trial Court's Ruling*

The trial court ruled that the defense had "failed to meet their burden to demonstrate that Defendant Gallizzi's Welcome Back message was made in furtherance of his constitutional right to free speech" and therefore denied the special motion to strike.[7,8]

---

[7]     Each party filed written evidentiary objections to its opponent's evidence. The trial court's posted tentative ruling did not rule upon any of these objections. Counsel pointed out this omission during the subsequent hearing but the judge still failed to make any ruling.

*Reid v. Google, Inc.* (2010) 50 Cal.4th 512 held, in the context of a summary judgment motion, that when the trial court "fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled, the trial court considered the evidence in ruling on the merits of the summary judgment motion, *and the objections are preserved on appeal*." (*Id.* at p. 534, italics added.) Defendants urges that the same principle should apply when an appellate court reviews the trial court's ruling on an anti-SLAPP motion. In other words, defendants claim that their objections are preserved and that they are entitled to a de novo review of the trial court's implicit overruling of those objections. Assuming arguendo that defendants are correct on this point, that principle does not benefit them in this case. Defendants have failed to identify any specific objections they believe were improperly overruled and to argue that they were prejudiced as a result. This constitutes a forfeiture of any appellate argument that the trial court erred in implicitly overruling the defense objections to Jacobson's evidence. (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

[8]     Concurrently with filing their special motion to strike, defendants filed a demurrer to Jacobson's complaint. The trial court overruled the demurrer to the causes of action for libel, slander and invasion of privacy but sustained with leave to amend the demurrer to the causes of action for intentional infliction of emotional distress and improper retaliation for exercise of First Amendment rights. The propriety of that ruling is not before us. For purposes of this appeal, the operative pleading is Jacobson's original complaint. (*Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 612-613.)

**DISCUSSION**

A. *An Anti-SLAPP Motion*

"A special motion to strike is a procedural remedy to dispose of lawsuits brought to chill the valid exercise of a party's constitutional right of petition or free speech. [Citation.] The purpose of [section 425.16] is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights. [Citation.] The Legislature has declared that the statute must be 'construed broadly' to that end." (*Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1165.)

Section 425.16 ""establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation."" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 312 (*Flatley*).) The statute posits a two-step process for determining whether a cause of action is subject to a special motion to strike. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. [Citations.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

B. *The First Step in the Anti-SLAPP Motion: Jacobson's Claims Arise From Protected Activity*

We review de novo the trial court's ruling on a special motion to strike. (*Flatley*, *supra*, 39 Cal.4th at p. 325.) To decide whether defendants discharged their burden of demonstrating that Jacobson's complaint arose from

10

constitutionally protected activity, we review the operative pleading and the supporting and opposing affidavits offered on the motion to strike. (*Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 329-330; see also § 425.16, subd. (b)(2).)

In determining whether a claim arises from protected activity, as defined in section 425.16, subdivision (b)(1), the "focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability -- and whether that activity constitutes protected speech or petitioning" as defined in section 425.16, subdivision (e). (*Navellier*, *supra*, 29 Cal.4th at p. 92.) "[W]e disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether [section 425.16] applies' and whether the trial court correctly ruled on the . . . motion." (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.) In this case, it is clear that Gallizzi's "Welcome Back" message is the predicate of Jacobson's lawsuit regardless of the specific cause of action plead.

Protected speech within the meaning of the anti-SLAPP statute includes "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) It "extends to statements and writings of governmental entities and public officials on matters of public interest and concern that would fall within the scope of the statute if such statements were made by a private individual or entity." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 17.) The "public interest" component "is met when 'the statement or activity precipitating the claim involved a topic of widespread public interest,' and 'the statement . . in some manner itself contribute[s] to the public debate.'" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA,*

11

*Inc.* (2005) 129 Cal.App.4th 1228, 1246.) The question whether something is an issue of public interest "must be "'construed broadly.'"" (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 23.) As we now explain, Gallizzi's message constitutes protected speech as defined by this statutory provision.

The thrust of Gallizzi's message—given in his capacity as Superintendent and directed to and heard by teachers, school staff, parents and students—was an exposition of what he believed to be the mission of District's schools: to create a learning environment for all students. It cannot be denied that the purpose of public education and the role that teachers play in fulfilling that purpose are "issue[s] of public interest" (§ 425.16, subd. (e)(4)) vigorously debated throughout the community. It is appropriate to include in that debate a discussion about which actions and attitudes by teachers either further or inhibit the goal of creating a learning environment. Citing examples of inappropriate behavior is an accepted pedagogical technique to identify which conduct does and does not help reach a particular goal. Gallizzi's veiled reference to Jacobson was simply one of four examples he gave of what he believed was unprofessional conduct—three of which went unanswered by colleagues when voiced, a fact that also troubled Gallizzi—that inhibited fulfilling District's mission.

Secondarily, Gallizzi used the message, given at the beginning of the school year, to explain the rationale for the new field trip policy. For several years, field trips had been a topic of public interest discussed throughout the community. Only three months earlier, four individuals (including Jacobson) had addressed the new proposed field trip policy at Board's public meeting. After the meeting, Gallizzi, pursuant to the direction of Board's President, convened a meeting of the Committee to make a final decision about field trips. The decision was made to pare them back and Gallizzi took the opportunity of presenting the "Welcome Back" message to address the newly adopted policy which was certainly an "issue

12

of public interest" (§ 425.16, subd. (e)(4)) because it affected teachers, students, parents and administrators employed by District.

We therefore conclude that the entirety of Gallizzi's "Welcome Back" message, including its references to what Gallizzi believed represented negative attitudes by teachers (including Jacobson), was constitutionally protected speech on issues of public interest:  the purpose of public education, the role of public school teachers in furthering that purpose and District's field trip policy.  (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1436-1439 [school superintendent's critical statements about a school principal on whose campus incidents of racially motivated student violence had occurred were statements about "an issue of public interest"] and *McGarry v. University of San Diego*  (2007) 154 Cal.App.4th 97, 109-110 [statements by university officials explaining why the head football coach was terminated were statements about "an issue of public interest"]; see also *Ghafur v. Bernstein* (2005) 131 Cal.App.4th 1230, 1238 ["'Clearly, the governance of a public school system is of the utmost importance to a community, and school board policies are often carefully scrutinized by residents.'"].)

Jacobson's contrary argument is not persuasive.  She simply argues that Gallizzi's statements "were not protected activity; there is no First Amendment right to make false statements so the anti-SLAPP motion to strike fails." (Capitalization omitted.)  This argument misapprehends the two-step process the trial court undertakes in ruling upon a special motion to strike.  The trial court is not required to accept the plaintiff's claim that unprivileged defamatory statements were made and the defense is not required to show that no defamation occurred. Instead, the defense, in the first step of the process, need only "present a prima facie showing that the plaintiff's causes of action arise from acts of the defendant taken to further the defendant's rights of free speech or petition in connection with

13

a public issue. [Citation.] Only if the defendant makes this prima facie showing does the trial court consider the second step of the section 425.16, subdivision (b)(1) analysis; at that point, the burden shifts to the plaintiff to make a prima facie showing of facts which, if proven at trial, would support a judgment in the plaintiff's favor [for, e.g., defamation]. [Citation.]" (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1365.)

Further, none of the cases cited by Jacobson supports her argument that Gallizzi's statements did not constitute protected speech within the meaning of section 425.16, subdivision (e)(4). The vast majority of the cases involved fact patterns in which the appellate courts concluded that the gravamen of the plaintiff's case was not the defendant's constitutionally protected speech but, instead, was conduct not protected by the First Amendment. (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 415-423 [personal injury action based upon the plaintiff's use of dietary supplements arises from the defendant's manufacture and sale of a defective product, not the manufacturer's exercise of free speech even though the plaintiff included a cause of action for false advertising]; *Santa Monica Rent Control Bd. v. Pearl Street, LLC* (2003) 109 Cal.App.4th 1308, 1317-1320 [action by local rent control board alleging that the landlords sought to evade rent control statues is not subject to a motion to strike because the landlords' actions were not taken in furtherance of their constitutional rights to petition or to exercise free speech]; *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1397-1400 [lawsuit alleging that insurer had mishandled claims is not subject to a motion to strike because the defendant's activities did not arise from speech in connection with a public issue]; and *Paul for Council v. Hanyecz, supra,* 85 Cal.App.4th at p. 1365 [campaign money laundering is "not a *valid* activity undertaken by defendants in furtherance of their constitutional right to free speech"].) In the other case cited by Jacobson,

14

the appellate court concluded that a statutory exemption to a special motion to strike applied. (*City of Long Beach v. California Citizens for Neighborhood Empowerment* (2003) 111 Cal.App.4th 302 [legislative history of section 425.16, subdivision (d) establishes that an action to enforce local laws governing campaign contributions is not subject to a motion to strike].)

## C. *The Second Step in the Anti-SLAPP Motion: Jacobson Failed to Demonstrate a Probability of Prevailing Upon Her Claims*

Because defendants established that Jacobson's action arose from constitutionally protected speech, we turn to whether Jacobson showed a probability of prevailing on her claims.[9]  In that regard, Jacobson was required to "'"'demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by [her] is credited.'"'  [Citation.]" (*Lin v. City of Pleasanton* (2009) 176 Cal.App.4th 408, 425.)  We also consider the evidence offered by the defense to determine whether it defeats Jacobson's case as a matter of law. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398, and cases cited therein.)  The trial court must "grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

We find that Gallizzi's "Welcome Back" message was privileged, thereby establishing as a matter of law that Jacobson did not and cannot demonstrate a probability of prevailing upon the merits.

---

[9]  Even though the trial court did not reach the issue, "we can address [it] as it is subject to independent review.  [Citation.]" (*Roberts v. Los Angeles County Bar Assn., supra,* 105 Cal.App.4th at pp. 615-616.)

Section 47 provides: "A privileged publication or broadcast is one made: [¶] (a) In the proper discharge of an official duty." The statute "confers privileged status upon any statement made by a public official in the course of discharging his official duties." (*Royer v. Steinberg* (1979) 90 Cal.App.3d 490, 500.) The privilege applies to local officials, *including school superintendents,* who engage in the policy-making process and "protects any statement by a public official, so long as it is made (a) while exercising policy-making functions, and (b) within the scope of his official duties." (*Id.* at p. 501; *Morrow v. Los Angeles Unified School Dist., supra,* 149 Cal.App.4th at pp. 1441-1442 [section 47 applies to school superintendent].) The privilege is absolute and precludes liability even if the defendant made defamatory statements with actual malice. (*Saroyan v. Burkett* (1962) 57 Cal.2d 706, 708-710.)

Further, "the executive privilege broadly 'encompass[es] all discretionary acts essential to the proper exercise of an executive function' decision." (*Morrow v. Los Angeles Unified School Dist., supra,* 149 Cal.App.4th at p. 1442.) "'Because a public official's duty includes the duty to keep the public informed of his . . . management of the public business, . . . public statements by such officials are covered by the "official duty" duty privilege.'" (*Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1075, 1089.) If the defense in a special motion to strike establishes that the statements underlying the plaintiff's action are privileged under section 47, the trial court is required to grant the motion. (*Id.* at pp. 1086-1091.)

As Superintendent, Gallizzi is "the chief executive officer of the governing board of the district." (Ed. Code, § 35035, subd. (a).) In that capacity, he gave his "Welcome Back" message at the beginning of the 2010-2011 school year. The message was District's mission statement for the new school year. Not only was the message required viewing for all teachers but it was also disseminated to

16

school staff, parents and students. In this public message, Gallizzi set forth his theme for the year and what he hoped to accomplish. In that context, he gave four examples of what he believed to be inappropriate or negative attitudes of teachers that could undermine the goal of creating a learning environment for all of the students. In the example that indirectly referenced Jacobson, Gallizzi also addressed the public controversy surrounding the change in the field trip policy and explained why the decision to limit the number of field trips had been made. This type of annual communication at the beginning of a school year explaining policy is part and parcel of effective administration of a public school district and is therefore covered by the absolute privilege found in section 47. (See, e.g., *Kilgore v. Younger* (1982) 30 Cal.3d 770, 782 [section 47 applies to the Attorney General's press conference during which he released a report that suggested the plaintiff was involved in criminal activity]; *Saroyan v. Burkett, supra,* 57 Cal.2d at pp. 710-711 [section 47 applies to the Superintendent of Banks' public statements critical of the plaintiff]; *Maranatha Corrections, LLC v. Department of Corrections & Rehabilitation, supra,* 158 Cal.App.4th at pp. 1087-1091 [section 47 applies to the Director of Corrections' public release of a letter critical of a contractor and explaining the decision to terminate its contract]; *Morrow v. Los Angeles Unified School Dist., supra,* 149 Cal.App.4th at pp. 1440-1443 [section 47 applies to the school superintendent's statements critical of a school principal]; and *Royer v. Steinberg, supra,* 90 Cal.App.3d at pp. 500-503 [section 47 applies to a school district's board of trustees' public statement explaining its reasons for demoting the superintendent].)

Jacobson's respondent's brief contains no argument about section 47 although defendants' opening brief discussed the statutory provision at length.[10] Our conclusion that the absolute privilege applies makes it unnecessary to discuss any of Jacobson's arguments unrelated to the privilege, to consider whether Jacobson demonstrated a probability of prevailing based upon an analysis of the elements of each cause of action, or to reach any of defendants' alternative theories as to why the motion to strike should have been granted.

D.  *Attorney Fees*

"[A] defendant who prevails on a section 425.16 motion is entitled to an award of attorney fees [citation], including attorney fees for the appeal [citation]." (*Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1404; see also *Morrow v. Los Angeles Unified School Dist., supra,* 149 Cal.App.4th at p. 1446.)  Accordingly, we reverse the trial court's order denying the special motion to strike and remand the cause to the trial court to determine, among other things, the amount of attorney fees to which defendants are entitled.

---

**10**     Defendants raised this absolute privilege in the trial court in their special motion to strike.  Jacobson offered no specific argument or authority against its application.

## DISPOSITION

The trial court's order denying defendants' motion to strike under section 425.16 is reversed.  The matter is remanded with instructions to vacate the order, to enter a new order granting the motion, to dismiss Jacobson's complaint with prejudice, and to award attorney fees to defendants (including attorney fees on appeal) in an amount it will determine.  Defendants are to recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




SUZUKAWA, J.



19